# EXHIBIT A

(TO PLAINTIFF'S ATTORNEY: *Please Circle Type of Action Involved:*   -   TORT   -   MOTOR VEHICLE TORT -
CONTRACT   -   EQUITABLE RELIEF   -   OTHER.)

# COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

SUPERIOR COURT
CIVIL ACTION
No. 2009-00739-D

Calvin Lai Chan and Bonnie Kwok Ching Chan
.................................................................................................................., Plaintiff(s)

v.

Saxon Mortgage Service, Inc., WMC Mortgage, LLC, Wells Fargo
National Association as Trustee for Bank of America
.................................................................................................................., Defendant(s)

## SUMMONS

To the above named Defendant: Saxon Mortgage Service, Inc.

You are hereby summoned and required to serve upon   Christopher Weld, Jr.

plaintiff's attorney, whose address is   28 State Street, Boston, MA   02109   , an answer to the

complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the

day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the

complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at

Essex, ss.   either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim any claim which you may
have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's
claim or you will thereafter be barred from making such claim in any other action.

WITNESS, BARBARA J. ROUSE   , Esquire, at Salem, the 8th
day of   July   , in the year of our Lord two thousand nine

*Thomas H. Driscoll Jr.*

Clerk

NOTICE TO DEFENDANT - You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

## PROOF OF SERVICE OF PROCESS

    I hereby certify and return that on_____, 20___, I served a copy of the within summons, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (see Mass. R. Civ. P. (d) (1-5):

_____

_____

_____

Dated:_____, 20___.    _____

N.B.    TO PROCESS SERVER:-
       PLEASE PLACE <u>DATE</u> YOU MAKE SERVICE ON DEFENDANT IN
       THIS BOX <u>ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.</u>

7-9 , 2009.

COMMONWEALTH OF
MASSACHUSETTS

ESSEX. SS.

SUPERIOR COURT
CIVIL ACTION
No. 2009-00739-D

Calvin Lai Chan et al.

Plaintiff(s)

v.

Saxon Mortgage Services, Inc. et al.

Defendant(s)

SUMMONS
(Mass. R. Civ. P.-4)

| CIVIL ACTION COVER SHEET | DOCKET NO (S) | Trial Court of Massachusetts Superior Court Department County: Essex |
|---|---|---|

| PLAINTIFF(S) CALVIN LAI CHAN and BONNIE KWOK CHING CHAN | DEFENDANT(S) SAXON MORTGAGE SERVICE, INC, WMC MORTGAGE, LLC, WELLS FARGO NATIONAL ASSOCIATION AS TRUSTEE FOR BANK OF AMERICA. |
|---|---|
| ATTORNEY FIRM NAME ADDRESS AND TELEPHONE Attorney Name, Esquire, Todd & Weld LLP 28 State Street, 31st Floor, Boston, MA 02109 Board of Bar Overseers number:   BBO #522230 | ATTORNEY (if known) Attorney (If Known) |

## Origin code and track designation

Place an x in one box only:

- [x] 1. F01 Original Complaint
- [ ] 2 F02 Removal to Sup.Ct C.231,s.104 (Before trial)  (F)
- [ ] 3 F03 Retransfer to Sup Ct. C 231,s.102C (X)

- [ ] 4 F04 District Court Appeal c 231, s. 97 &104 (After trial)  (X)
- [ ] 5 F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ P 60) (X)
- [ ] 6 E10 Summary Process Appeal (X)

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO | TYPE OF ACTION (specify)   TRACK | IS THIS A JURY CASE? |
|---|---|---|
| A03 | Commercial Paper        ( F ) | [x] Yes      [ ] No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A.   Documented medical expenses to date:
1    Total hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $
2    Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $
3.   Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $
4.   Total physical therapy expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . $
5    Total other expenses (describe) . . . . . . . . . . . . . . . . . . . . . . . . . . . $
                                                                      Subtotal $ . . . . . . . . . . . .
B    Documented lost wages and compensation to date . . . . . . . . . . . . . . . . . . $
C.   Documented property damages to date . . . . . . . . . . . . . . . . . . . . . . . . $
D.   Reasonably anticipated future medical and hospital expenses . . . . . . . . . . . . $
E    Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . . . . . . . . . . $
F.   Other documented items of damages (describe)

G.   Brief description of plaintiff's injury, including nature and extent of injury (describe)

                                                                      $ . .
                                                            TOTAL $ . . . . . . . . . . . .

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

Claims due to predatory lending practices

                                                            TOTAL $.   In excess of
                                                                       $100,000 . . . . .

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____   DATE: 4/23/09

ACTIC-6 mc005-11/99
A O S C 1-2000

# TODD & WELD LLP

ATTORNEYS AT LAW
28 STATE STREET
BOSTON, MASSACHUSETTS 02109

CHRISTOPHER WELD, JR.
Email: cweld@toddweld.com
Direct Facsimile: 617-624-4858

TELEPHONE: (617) 720-2626
FACSIMILE: (617) 227-5777
www.toddweld.com

June 25, 2009

Civil Clerk's Office
Essex Superior Court
Lawrence Session
43 Appleton Way
Lawrence 01841

Re:  *Calvin Chan, et al. v. Saxon Mortgage Services, Inc., et al.*
Essex Superior Court, Civil Action No. 2009-00739-D

Dear Sir/Madam:

Enclosed herein for filing in the above-referenced matter is First Amended Complaint and Jury Demand.

Thank you for your attention to this matter.

Very truly yours,

Christopher Weld, Jr.

CW:jmm
Enclosures

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss

SUPERIOR COURT
DEPARTMENT OF
THE TRIAL COURT

)
CALVIN LAI CHAN and BONNIE KWOK )
CHING CHAN, )
)
Plaintiffs, )
)
v. )
) CIVIL ACTION NO.
) ESCV2009-00739-D
SAXON MORTGAGE SERVICE, INC. WMC )
MORTGAGE, LLC, WELLS FARGO )
NATIONAL ASSOCIATION AS TRUSTEE FOR)
BANK OF AMERICA, )
Defendants. )
)
_____)

## FIRST AMENDED COMPLAINT AND JURY DEMAND

### Introduction

1.    This Complaint is brought by Calvin Lai Chan and Bonnie Kwok Ching Chan (the "Chans") against certain lending and servicing institutions who originated, hold and service a note and first mortgage secured by the Chans primary residence located at 31 Woburn Street, Andover, Massachusetts. The defendants engaged in various predatory lending practices in connection with the mortgage loan advanced to the Chans in or about April 2005. The Chans seek to enjoin a foreclosure of the mortgage on their primary residence, to restructure the mortgage and to recover damages and attorneys' fees and, in the alternative, rescission.

## Parties

2.      Calvin Lai Chan is an individual who resides at 31 Woburn Street, Andover, Massachusetts.

3.      Bonnie Kwok Ching Chan is an individual who resides at 31 Woburn Street, Andover, Massachusetts. Mr. and Mrs. Chan at all relevant times have been husband and wife.

4.      WMC Mortgage, LLC, formerly known as WMC Mortgage Corp., collectively ("WMC") has a principal place of business in Woodland Hills, California. On information and belief, WMC has been and is in the business of originating, funding and selling first mortgage loans to individuals secured by their primary residences.

5.      Saxon Mortgage Service, Inc. ("Saxon") is in the business of servicing mortgage loans on behalf of institutional holders of mortgage notes. At all relevant times, Saxon has serviced the Chan's first mortgage loan. On information and belief, Saxon has a principal place of business at 4708 Mercantile Drive North, Fort Worth, Texas.

6.      Bank of America, NA is a financial institution in the business of, *inter alia*, originating, funding, selling and buying mortgage loans to individuals secured by their personal residences. Bank of America is the current holder of the mortgage note executed by the Chans that is the subject of this litigation and acts with regard to that note through Wells Fargo National Association as Trustee for Bank of America. Bank of America, N.A. has a principal place of business at 100 North Tryon Street, Charlotte, North Carolina 28255.

2

## Facts

7.      On or about April 25, 2005, the Chans entered into a mortgage financing transaction with WMC. A representative of WMC, Northside Mortgage Group, LLC ("Northside"), facilitated the transaction for WMC.

8.      The mortgage refinancing transaction followed by exactly one year a prior transaction between WMC and the Chans whereby WMC provided a first and second mortgage loan secured by the Chans' residence thereby increasing the total indebtedness secured by the residence substantially. At the 2004 additional financing, WMC also extracted substantial fees from the Chans. As part of the refinancing in April 2005, additional points, closing costs and fees were charged to the Chans after WMC and its agent convinced the Chans to consolidate their debt secured by their primary residence in a single loan and mortgage running to WMC.

9.      On or about December 22, 2004, less than eight months from the Chans' last mortgage transaction with WMC, a WMC representative approached Mr. Chan by telephone claiming that he could assist the Chans in saving several hundred dollars per month by consolidating the two loans as one single mortgage with a 40-year mortgage. The WMC representative asked Mr. Chan to provide to him a most recent paystub and the last six months bank statements to begin the refinancing process, which he did.

10.     On or about April 6, 2004, the WMC representative called Mr. Chan to discuss the terms of the proposed refinancing and initially, offered to Mr. Chan an adjustable interest rate of 6.2% good for the first two years. The loan amount would be $741,000 for a term of 40 years. The WMC representative also advised Mr. Chan that he could lock-in the 6.20% interest rate and Mr. Chan told him to do so. The WMC

3

representative requested a copy of Mr. Chan's W-2 for 2004 and copies of mortgage loan statements. Mr. Chan provided the requested documents and information to the WMC representative on that day by facsimile.

11.     On or about April 8, 2005, the WMC representative called Mr. Chan to continue the discussion of the refinancing and Mr. Chan told the WMC representative that the initial two (2) year lock-in period was too short as the Chans' first mortgage rate at that time was locked in for five (5) years and the interest rate would not be subject to change until June, 2009. Mr. Chan told the WMC representative that he would like to change the initial period to three (3) years instead of two (2) years. The WMC representative advised that the interest rate may increase and he had to discuss the request with the lender.  Mr. Chan also, told the WMC representative that he was the only wage earner and his spouse was a homemaker. Mr. Chan advised the WMC representative that he would be the primary borrower on the mortgage loan.

12.     Thereafter, WMC, through its agent, Northside, represented to the Chans that they were approved for a forty (40) year adjustable rate mortgage secured by their primary residence in the amount of $741,000. They had offered to the Chans an interest rate of 6.25% for an initial period of three years with a monthly payment of $4,206.95. The annual percentage rate ("APR") for the loan was represented to be 6.395%. The loan was based on the appraised value of the residence of $780,000 which constituted a 95% loan to value ratio.  WMC further represented to the Chans that the loan would fully amortize over the loan term and that there would be no balloon payment.

4

13.     The WMC representative confirmed to Mr. Chan that he would state the committed terms on the loan application and also, on various disclosure statements as required under Federal and State law and send to the Chans for their signatures.

14.     As part of the application process, WMC, acting by and through Northside, completed the loan application on behalf of the Chans. A representative interviewed Mr. Chan concerning the Chans' income. Mr. Chan reported that he had monthly income of approximately $8,800 which annualized to approximately $106,000. Mr. Chan further informed the representative that his wife did not work and that he had no other household income. Nonetheless, the representative asked whether the Chans had any other corporations or business entities. The Chans did disclose that they had formed a corporation to launch a possible business venture but that the business venture had not proceeded. The only verification of income requested of the Chans and thereafter provided was a form W-2 for Mr. Chan for 2004 and a copy of a current paycheck stub which reflected income consistent with the amount he reported to the mortgage representative.

15.     Unbeknownst to the Chans, the WMC representative completed the application form on April 8, 2005 reflecting monthly income for Mrs. Chan of $6,100. The form was mailed to the Chans for signatures on April 8, 2005 together with related documents outlining the terms of the loan commitment by WMC. WMC did not disclose that it had changed the income presented on the form and that the revised information was false and fabricated. On or about April 12, 2005, the Chans executed the loan application and related documents disclosing the terms of the loan and they were unaware of the fictitious income added by the WMC representative.

5

16.    A few days prior to the closing, a representative from WMC contacted Mr. Chan and indicated that the lender wished to designate Mrs. Chan as the "borrower" and Mr. Chan as the "co-borrower" because Mrs. Chan allegedly had a higher credit score.

17.    On or about April 25, 2005, the Chans attended a closing at an attorney's office appointed for them by WMC. No attorney was present nor was a Notary Public present. The Chans were asked to sign numerous documents at the time of closing. No one explained any of the documents to the Chans, requested that they read them or asked them if they understood them. The Chans executed the documents as instructed but none of their signatures was witnessed by a Notary.

18.  .  At the conclusion of the closing, the Chans were provided with an executed copy of the Federal Truth-In-Lending Disclosure Statement, Settlement Statement, Closing Instructions, Adjustable Rate Note, Mortgage and Adjustable Rate Rider. They also received a copy (but not two copies) of the Notice of Right to Cancel, but the date of the refinancing transaction and rescission date were blank on both Notices.

19.    On or about April 28, 2005, the Chans received from the closing attorney's office copies of the remaining closing documents they had executed on April 25, 2005. On or about May 7, 2005, the Chans received a letter from the closing attorney's office requesting that they sign a document called a "Balloon Rider". The covering letter specifically instructed the Chans to sign and backdate this document to April 25, 2005. Accordingly, the Chans executed this document as requested and returned it to the closing attorney's office as they assumed this document was part of the closing documents that they had signed on April 25, 2005 and they were completely unaware that WMC had changed the terms of the mortgage loan at closing.

6

20. On information and belief, in or about July 2005, WMC sold the Chans' loan to Bank of America and Saxon began servicing the mortgage.

21. From June 2005 to April 2008, the Chans made mortgage payments of principal and interest in the monthly amount of $4,233.10 and the Chans paid the property tax and insurance directly which totaled approximately $900 per month. Beginning in early 2008, Saxon requested the Chans to pay the property tax to the escrow account at approximately $1,070 per month which included an amount of $370 to cover the repayment of the negative balance in the escrow account. But the Chans continued to pay the insurance directly at approximately $135 per month. Throughout the past years, the monthly payments made by the Chans to service the mortgage obligation including taxes and insurance well exceeded 50% of the Chans' gross income.

22. Pursuant to the adjustable rate provision of the Note, in or about June 2008 the interest rate on the loan was increased from 6.3% to 9.3%. This increase in rate along with certain personal, negative financial developments rendered the Chans unable to make the exorbitant payments required to service their loan. Accordingly, the Chans fell in arrears on the loan.

23. Through a workout with Saxon on behalf of Bank of America, the interest rate was adjusted back to the 2005 rate of 6.3%. However, the Chans' financial situation continued to deteriorate thereafter due to a series of family issues compounded by these heavy mortgage payments. In November 2008, the Chans again fell in arrears on their mortgage payments.

24. On or about January 29, 2009, a home service worker engaged by Saxon broke the front door lock of the Chans residence using an electric screw driver trying to

7

force his way into the house. Mrs. Chan was at home at the time and shouted at this man who she believed to be an intruder. The service worker stated that he had received an order from Saxon to do winterization work and was told by Saxon that the house was vacant. The Chans did not receive any prior notice from Saxon that a service worker would be coming and had never failed to occupy the house. The Chans complained to Saxon immediately regarding this incident but received no response.

25.     In the wake of this incident, the Chans began to examine closely the documentation they were provided at the closing of the loan. The loan documentation completed by a representative of WMC and not fully disclosed to the Chans contained numerous factual errors. Further, it was apparent that the Chans had not been provided with all required disclosure statements under federal and state law and the terms of the actual loan advanced were inconsistent and conflicted with the represented terms of the loan prior to the closing.

26.     For example, the Uniform Residential Loan Application with a back-dated preparation date of February 15, 2005, that the Chans received after the closing reflected Mrs. Chan's income as $12,376 per month notwithstanding the fact that Mr. Chan had repeatedly represented to the WMC representative that Mrs. Chan did not work or generate any income. It was clear that WMC through its representative had intentionally falsified the loan application to qualify the Chans for a mortgage that they could never otherwise qualify for or pay.

27.     Mr. Chan had always been told and provided a commitment by WMC that they would have a 480-month loan at an interest rate of 6.25% for an initial three-year period that would fully amortize principal with no balloon payment. In fact, the loan

8

documents that they were coerced into executing were for a term of 360 months at an interest rate of 6.30% fixed for an initial three years plus a balloon payment in the final year of $490,832.84.

28.     The Chans were perplexed by the irregularities and discrepancies as shown on the face of the loan documents. In or about February 2009, for the first time, the Chans consulted with legal counsel concerning the predatory lending practices to which they had been subjected.

29.     Upon further examination of the loan documents and among all the inconsistencies and irregularities in the closing documents which included the mortgage note and other loan documents, there were only three (3) loan documents which were executed by the Chans on April 25, 2005 that reflected the correct terms of the loan as committed by the WMC representative on April 8, 2005. These three (3) documents were:

   a.   The Massachusetts Mortgage Broker Disclosure Statement indicated the term of the loan was 40 years.

   b.   The Massachusetts – Addendum to the Uniform Residential Loan Application (URLA) FNMA 1003 indicated the approximate expiration date of the Note would be May 1, 2045 (40 years).

   c.   The Mortgage Lender Disclosures required by the Attorney General's Consumer Protection Regulations indicated no balloon payment at the end of the term.

30.     The annual percentage rate ("APR") of the loan that the WMC representative committed to the Chans on April 8, 2005 was 6.395% but significantly increased to 9.456% at closing according to the Federal Truth-in-Lending Statement

9

executed by the Chans on April 25, 2005 and further increased to 9.787% as shown on the Massachusetts Mortgage Broker Statement. These changes were not disclosed to the Chans at the closing.

31.     On or about February 25, 2009, the defendants were each served with a Demand Letter pursuant to M.G.L. c. 93A §§ 2 and 9. A copy of the Demand Letter is attached hereto as *Exhibit A*. None of the defendants made timely response to the Demand Letter within the required thirty (30) days.

32.     Instead, Bank of America, through its serving agent Saxon, has referred collection of the debt allegedly owed by the Chans to a law firm which, on information and belief, has begun foreclosure proceedings. The Chans, through their counsel, have made numerous attempts to discuss the allegations contained in the Demand Letter and the irregularities in the origination and administration of the loan with a responsible representative of Bank of America and/or Saxon. Prior to filing the initial complaint in this matter, counsel for the Chans had never been afforded the opportunity to speak with any representative who had any authority to discuss negotiation and resolution of the issues relating to this loan.

33.     On or about May 19, 2009, the Chans, through their counsel, received certain loan documents from a law firm in Boston that Saxon has engaged to initiate the foreclosure process of the Chans' primary residence. Included in the package were documents on which the Chans' signatures had been forged and documents that had been altered after the Chans signed them, including the Right to Cancel.

34.     Due to the defendants' predatory lending practices in violation of several state and federal statues, the Chans are facing possible foreclosure on their primary

residence where they have lived for the past twenty-one years and irreparable harm as a result.

**COUNT I**
**(Violation of M.G.L. c. 140D)**

35.     The Chans incorporate the allegations contained in Paragraphs 1 through 34 herein.

36.     WMC entered into a consumer credit transaction with the Chans on or about April 25, 2005.

37.     In connection with the consumer credit transaction with the Chans, WMC was required to comply with the requirements of M.G.L. c. 140D.

38.     WMC failed to provide the required disclosures pursuant to M.G.L. c. 140D and regulations issued pursuant thereto in connection with the consumer credit transaction with the Chans. These failures included, but were not be limited to, the failure to provide a completed disclosure concerning the Chans' right of rescission and to provide the number of copies required as well as several other conflicting, incomplete and/or inadequate disclosures concerning the loan terms.

39.     As a result of WMC's breach of M.G.L. c. 140D and regulations, the Chans continues to have the right of rescission (which they are executing by filing this Complaint) and have suffered damages.

40.     On information and belief, Bank of American is Assignee of WMC with respect to the note and mortgage documents procured from the Chans in connection with the consumer credit transaction referenced herein. Accordingly, the Chans right to rescission remains as to Bank of America. Further, because other violations of M.G.L. c. 140D and regulations pursuant thereto were apparent from the face of the loan documents

11

generated in connection with the consumer credit transaction referenced herein, Bank of America remains liable to the Chans for damages, penalties and attorneys' fees pursuant to M.G.L. c. 140D.

**COUNT II**
**(Violation of 15 U.S.C. §1600, et al.)**

41.     The Chans incorporate the allegations contained in Paragraphs 1 through 34 herein.

42.     WMC entered into a consumer credit transaction with the Chans on or about April 25, 2005.

43.     In connection with the consumer credit transaction with the Chans, WMC was required to comply with the requirements of 15 U.S.C. §1600, et al. and regulations issued pursuant thereto, including Regulation Z.

44.     WMC failed to provide the required disclosures pursuant to 15 U.S.C. §1600, et al in connection with the consumer credit transaction with the Chans. These failures included, but may not be limited to, the failure to provide a completed disclosure concerning the Chans' right of rescission and to provide the number of copies required as well as several other conflicting, incomplete and/or inadequate disclosures concerning the loan terms.

45.     As a result of WMC's breach of 15 U.S.C. §1600, et al, the Chans their right of rescission and have suffered damages.

46.     On information and belief, Bank of American is Assignee of WMC with respect to the note and mortgage documents procured from the Chans in connection with the consumer credit transaction referenced herein. Accordingly, the Chans' right to

12

rescission, remains as to Bank of America. Further, because other violations of 15 U.S.C.

§1600, et al were apparent from the face of the loan documents generated in connection

with the consumer credit transaction referenced herein, Bank of America remains liable to

the Chans for damages, penalties and attorneys' fees pursuant to 15 U.S.C. §1600, et al.

<u>COUNT III</u>
**(Violation of M.G.L. c. 93A §§ 2 and 9)**

47.     The Chans incorporate the allegations contained in Paragraphs 1 through 34

herein.

48.     At relevant times, each of the defendants has been engaged in trade or

commerce with the Chans.

49.     WMC has engaged in unfair and deceptive trade practices in connection

with its dealings with the Chans including, but not limited to, falsifying loan application

information, failing to comply with disclosure requirements, altering the terms of the

lending arrangement without notice to the Chans and engaging in predatory loan practices

including advancing a first mortgage loan secured by the Chans residence that WMC knew

or should have known that the Chans could never repay.

50.     Saxon and Bank of America have engaged in unfair and deceptive trade

practices. These acts and omissions include but may not be limited to failing to address the

irregularities in the lending process in connection with administering and owning the

Chans' mortgage note, initiating foreclosure proceedings with full awareness of the

illegality of the original loan to the Chans and refusing to renegotiate the terms of the loan

to those consistent with federal and state regulations and the Chans' ability to pay.

13

51.    As a result of these unfair and deceptive trade practices, the Chans have suffered significant and substantial harm, including possible irreparable harm through the potential loss of their residence of twenty-one years.

### COUNT IV
### (Negligence)

52.    The Chans incorporate the allegations contained in Paragraphs 1 through 39 herein.

53.    At all relevant times, the defendants owed the Chans a duty of reasonable care and honesty.

54.    In connection with sourcing, owning and administering the mortgage note, the defendants were negligent and breached that duty.

55.    As a result of the defendants' negligence, the Chans have suffered and will continue to suffer significant and substantial financial harm as well as possible irreparable harm by the potential loss of their residence of twenty-one years.

### COUNT V
### (Misrepresentation/Fraud)

56.    The Chans incorporate the allegations contained in Paragraphs 1 through 33 herein.

57.    WMC engaged in fraud and misrepresentation by its actions in falsifying documents and altering loan terms without informing the Chans in connection with the origination and consummation of the mortgage note at issue. Bank of America and Saxon have participated and knowingly furthered the fraud and misrepresentation by seeking to enforce the loan documents and proceeding with foreclosure.

14

58. As a result of these actions, the Chans have suffered substantial and significant harm, including irreparable harm.

## COUNT VI
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

59. The Chans incorporate the allegations contained in Paragraphs 1 through 36 herein.

60. The relevant application disclosure documents and loan documents involved in the origination, consummation and administration of the Chans' mortgage note contained an implied covenant of good faith and fair dealing.

61. Through their actions as described herein, the defendants have breached the implied covenant of good faith and fair dealing.

62. As a result of the defendant's wrongful actions, the Chans have suffered substantial and significant irreparable harm.

### Prayer For Relief

WHEREFORE, the Chans respectfully request that this Court:

A. Enjoin defendants Saxon and Bank of America from foreclosing on the mortgage securing the Note that is the subject of this Complaint;

B. Rescind the mortgage loan to the Chans and provide credit to the Chans for all fees, late fees, origination fees, and interest payments made to date on the loan against any claimed due principal balance;

C. Award the Chans damages in an amount to be determined by the trier of fact and to be offset against any required rescission payment;

D. Treble all damages hereunder pursuant to M.G.L. c. 93A;

E.  Award punitive damages in accordance with M.G.L. c. 140D and 15 U.S.C § 1600 et sec.

F.  Award the Chans reasonable attorney's fees and costs in connection with prosecuting this Complaint; and

G.  Grant the Chans such other and further relief as this Court deems appropriate including but not limited to restructuring the existing mortgage note through a significant write-down of the principal balance.

## JURY DEMAND

**THE CHANS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**

Respectfully submitted,

CALVIN LAI CHAN and
BONNIE KWOK CHING CHAN

By their Attorney,

Christopher Weld, Jr. (BBO # 522230)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
617-720-2626
cweld@toddweld.com

16

EX. A



# TODD & WELD LLP

ATTORNEYS AT LAW
28 STATE STREET
BOSTON, MASSACHUSETTS 02109

CHRISTOPHER WELD, JR
Email  cweld@toddweld.com

TELEPHONE  (617) 720-2626
FACSIMILE  (617) 227-5777
www.toddweld.com

Direct Facsimile  617-624-4858

February 25, 2009

Northside Mortgage Group, LLC
PO Box 72
Mount Airy, NC 27030

CERTIFIED MAIL
Saxon Mortgage Service, Inc.
4708 Mercantile Drive North
Fort Worth, TX  76137

CERTIFIED MAIL
WMC Mortgage Corporation
6320 Canoga Avenue
10th Floor
Woodland Hills, CA 91367

Wells Fargo National Association
 As Trustee for Bank of America
c/o Saxon Mortgage Services, Inc.
P.O. Box 163405
Fort Worth, TX 76161

### DEMAND LETTER – M.G.L. c. 93A

Re:   *Mortgage Loan No. 2000127705 - (WMC Mortgage Loan No. 11151766)*
      *Borrowers: Bonnie K. Chan and Calvin L. Chan*
      *Address: 31 Woburn Street, Andover, MA*

Dear Sirs/Madams:

Please be advised that this office represents Calvin L. Chan and Bonnie K. Chan in connection with the above referenced mortgage loan.

On or about April 25, 2005, the Chans entered into a mortgage refinancing transaction with WMC Mortgage Corporation ("WMC"). Shortly thereafter, they were informed that Saxon Mortgage Services, Inc. ("Saxon") was appointed the servicing agent for purposes of administering the mortgage loan. Northside Mortgage Group, LLC ("Northside") was the mortgage broker and sourced mortgage funds on behalf of the Chans. Subsequently, the Chans were informed that the loan was sold and/or assigned to Wells Fargo National Association as Trustee for Bank of America. (WMC, Saxon and Wells Fargo are collectively referred to as the

Page 2
February 25, 2009

"Lender"). Based on a review of the information contained in certain documents provided to
the Chans as well as the terms, conditions and circumstances of the loan, it is apparent that
numerous misrepresentations were made to the Chans in connection with the refinancing and
that the loan itself was unfair and deceptive within the meaning of Mass. Gen. L. ch. 93A, § 2.

At the outset of the refinancing, Northside represented to the Chans that they were
approved for a 30 year, adjustable rate mortgage secured by their primary residence in the
amount of $741,000. Northside offered and the Chans accepted subject to closing, an interest
rate of 6.25% for the 30-year mortgage. The loan was based on the appraised value of the
residence of $780,000 which constituted a 95% loan to value ratio. It was further represented to
the Chans that the loan would amortize over the 30 years and that there would be no balloon
payment.

In applying for the loan, Northside completed the loan application on behalf of the
Chans. The mortgage broker interviewed the Chans concerning their income. Mr. Chan
reported that he had monthly income of $8,833 which annualized to $106,000. He further
informed the broker that his wife did not work. Nonetheless, the broker asked whether the
Chans had any other corporations or other business entities. The Chans disclosed that they had
formed a corporation to launch a possible business venture but that the venture had not
proceeded and the company (CFGlobe.Com, Inc.) did not generate any revenue or income. The
only verification of income requested of the Chans and thereafter provided was a form W2 for
Mr. Chan for 2004 and a copy of a current paystub which reflected income consistent with the
amount he reported to the mortgage broker.

Notwithstanding the foregoing, the broker proceeded to complete the mortgage
application and reflected monthly income for the "co-borrower" (Mrs. Chan) of $6,100. When
the form was presented to the Chans for signature, they assumed that the broker had completed
the form in accordance with the information they had provided and, accordingly, executed the
document. Subsequently, the mortgage broker called Mr. Chan several days before the closing
informed him that the Lender and/or the broker had designated Mrs. Chan as the
"borrower" and Mr. Chan as the "co-borrower" because Mrs. Chan had a higher credit score.
Thereafter, the Chans were provided with a copy of a Uniform Residential Loan Application
with a transmittal date of April 26, 2005 (after the closing) which they now realize reflects that
the revised application falsely represented Mrs. Chan's income as $12,376 per month and Mr.
Chan's income as $8,975 per month. The Chans never provided these numbers to the mortgage
broker for inclusion in the application and were unaware that these numbers were being used in
connection with this loan application. Obviously, their joint monthly income (the only wage
earner was and is Mr. Chan) was less than $9,000.

At the loan closing, the Chans appeared at the attorney's office appointed for them by
the Lender. No attorney was present nor was a Notary Public present. The Chans were asked to
sign numerous documents at the time of closing. No one explained any of the documents to the
Chans, requested that they read them or asked them if they understood them. The Chans
executed the documents as instructed but none of their signatures were witnessed by a Notary.

Page 3
February 25, 2009

In approximately May 2008, the Chans fell behind in connection with their May mortgage payment and the loan became impossible for them to manage when the adjustment of the interest rate increased from 6.30% to 9.30% as of June 2008. Thereafter, through a workout, the arrearage was added to the outstanding principle and the rate of interest was held for a five-year period at the original rate of 6.3%. However, the Chans' financial situation continued to deteriorate thereafter due to a series of family issues compounded by the heavy mortgage payments. In November 2008, the Chans again fell in arrears on their mortgage payments. At the request of the Lender, on January 16, 2009, the Chans filed an application for a restructuring of the loan due to hardship but have received no response whatsoever to their request. Previously, they had received a letter dated December 4, 2008 providing them a ninety (90) day grace period prior to the commencement of foreclosure proceedings.

With the commencement of foreclosure approaching and with no response to their restructuring request from the Lender, the Chans, for the first time, sought legal assistance in reviewing their loan transaction. As a result of this review, they now understand that the loan provided to them had different and more onerous terms than that for which they had bargained. Further, said loan was both unfair and deceptive in violation of Mass. Gen. L. ch. 93A, § 2.

The misrepresentations concerning the terms of the loan are material. The Chans had a commitment for an initial rate of 6.25%. The note as executed contains an initial rate of 6.3%. The initial disclosure statements provided to the Chans reflected a 30 year term and indicated that there would be no balloon payment. Accordingly, the Chans believed that their loan would amortize completely over the 30 year period. Instead, the executed loan documents reflect a massive balloon payment in the final year of $490,832.84.

More importantly, based on the verified information provided by the Chans to the mortgage broker, it was surely clear to both the mortgage broker and the Lender that the Chans could not make the scheduled payments under the terms of the loan. First, the loan was written as an adjustable rate mortgage with an initial teaser rate of 6.3%. After three years, the rate was to adjust to 9.3%. Even at the initial teaser rate, the scheduled payments of principle, interest and related costs as reflected on the application completed by the mortgage broker were $4,756.95 (which substantially understated the real estate tax obligation and did not include homeowner's insurance). This figure represented almost 54% of the Chans' monthly gross income. When the rate increased to 9.3%, monthly payments would exceed $7,000 constituting over 80% of the Chans' before tax income.

These loan terms essentially were equivalent to those that the Supreme Judicial Court of Massachusetts has been deemed "presumptively unfair". See Commonwealth v. Freemont Investment and Loan, 452 Mass. 733 (2008). Even more compelling than the facts in Commonwealth v. Freemont Investment and Loan, it is clear that the Lender and broker artificially manipulated and inflated the Chans' income without fully informing them to qualify them for a loan that they clearly could not repay.

Further, even though the conduct relating to this loan may not technically fall within the Predatory Home Loan Practices Act, Mass. Gen. L. ch. 183C, "the conduct the act prohibits,

Page 4
February 25, 2009

and deems a violation of G.L. 93A, is similar to the central element of unfairness the judge found in Freemont's lending practices: the origination of a home mortgage loan that the lender should recognize at the outset that the borrower is not likely to be able to repay. See G.L. ch. 183C, § 4". Commonwealth v. Fremont Investment and Loan, 452 Mass. 748-749.

Please consider this letter as a demand on behalf of the Chans that the lender immediately:

A.   Forbear from any and all foreclosure activities;

B.   Substantially renegotiate the terms and conditions of the mortgage loan consistent with the concepts of fairness required under Massachusetts law;

C.   Pay all damages incurred by the Chans; and

D.   Reimburse the Chans for any and all legal fees incurred to date and in connection with the restructuring of this mortgage loan in accordance with Mass. Gen. L. ch. 93A.

Please confirm immediately that the Lender will forbear from foreclosure proceedings and engage in renegotiation of the loan terms. In the absence of such an affirmation, the Chans will be required to seek injunctive relief. In the event they are successful, they intend to seek full reimbursement of all legal fees, an award of actual damages and a trebling of all damages pursuant to Mass. Gen. L. ch. 93A.

This demand letter is made pursuant to M.G.L. c. 93A, §§ 2 and 9. You have thirty days to make a reasonable offer of settlement. Failure to respond and to make a reasonable offer within thirty days may result in award of up to treble damages and attorneys fees in the event you are ultimately found liable to the Chans.

Please contact the undersigned immediately to address this situation.

Very truly yours,

Christopher Weld, Jr.

CW:ed