UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
CALVIN LAI CHAN and BONNIE KWOK        )
CHING CHAN,                            )
      Plaintiffs,                         )
                                       )
   v.                                   )
                                       )    Civil Action No.
SAXON MORTGAGE SERVICE, INC.,          )    1:09-cv-11265
WMC MORTGAGE LLC, WELLS FARGO          )
NATIONAL ASSOCIATION AS TRUSTEE        )
FOR BANK OF AMERICA,                   )
      Defendants.                         )
_____ )


**i. <u>PLAINTIFFS' CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS OF
DEFENDANTS WMC MORTGAGE, LLC, SAXON MORTGAGE SERVICE, INC
AND WELLS FARGO NATIONAL ASSOCIATION</u>**[1]

### i. <u>Introduction</u>

In April 2005, Defendant WMC Mortgage, LLC ("WMC") provided Plaintiffs Calvin

Chan ("Mr. Chan") and Bonnie Chan ("Mrs. Chan") (collectively, "Plaintiffs" or the "Chans")

with loan documents to refinance their existing mortgages with WMC that contained materially

false information intended to inflate their income so as to qualify the Chans for a loan that WMC

knew the Chans could not afford.  These loan documents contained numerous other terms that

had been altered from their original terms to which the Chans agreed.  The end result was a

refinancing that the Chans did not envision and could not afford, under terms to which they did

not and never would have agreed had they been disclosed.

---

[1] There are two outstanding motions to dismiss: Saxon Mortgage Service Inc,'s and Wells Fargo National
Association As Trustee For Bank of America's Motion To Dismiss and Defendant WMC Mortgage, LLC's
Memorandum of Law in Support of Its Motion To Dismiss The First Amended Complaint.  After receiving leave of
Court, Plaintiffs file this consolidated opposition to both motions.

Defendant Saxon Mortgage Service, Inc.'s ("Saxon") has at all times serviced the loan at issue here.  After the Chans fell into arrears on their mortgage payments, Saxon, without notifying the Chans, hired a home service worker to break into the Chans' home purportedly to do winterization work under the instructions that that the house was vacant.   Saxon did not respond to the Chans' complaints about this unlawful break-in.  Saxon also sent copies of loan documents to the Chans in conjunction with foreclosure proceedings that contained forged signatures of the Chans and other terms that had clearly been fabricated after the Chans had signed the documents.  Since Saxon began foreclosure proceedings, it has refused even to discuss the allegations contained in the Chans' Amended Complaint and/or find an alternative to foreclosure.

Less than three months after the April 25, 2005 closing, this loan was sold to Defendant Wells Fargo National Association as Trustee for Bank of America ("Wells Fargo").  Wells Fargo is liable here as the assignee of WMC, and the same rights of rescission and for damages available against WMC are also available against Wells Fargo.  M.G.L. c. 140D ("Chapter 140D"), which is the Massachusetts counterpart to the federal Truth-In-Lending Act ("TILA"), provides that a borrower has the same right of rescission against an assignee as the borrower would have against the original lender.  See M.G.L. c. 140D, § 33(c).  Further, Wells Fargo is liable for damages as an assignee of WMC under both the federal and state TILA for the inaccuracies that were apparent on the face of the disclosures and related documents.  See 15 U.S.C. §§ 1641(c), (e)(1); Myers v. Federal Home Loan Mortgage Co. (In re Myers), 175 B.R. 122, 127 (Bankr.D. Mass. 1994).

In its motion to dismiss, WMC maintains that it is inappropriately named as a defendant in this lawsuit because it took no part in the actions leading to the predatory loan refinance.  The hollowness of this assertion is revealed by several documents showing WMC's active

participation in the refinancing process.  On February 15, 2005, WMC requested a credit check

for Mr. and Mrs. Chan even though the Chans did not actually apply for a loan until April.  In

addition, the attorney who assisted the Chans with the closing on behalf of the lender was

provided by WMC.  Further, WMC sent this attorney, *after* the closing, a copy of a "Balloon

Rider" to be sent to the Chans for endorsement and with instructions to backdate the rider to the

date of the closing.  This Balloon Rider is a critical document as the original agreement between

the Chans and WMC clearly provided that the loan would not include a balloon payment.

Inexplicably, the final loan documents provided by WMC to the Chans included a balloon

payment.  WMC cannot escape its direct involvement in the wrongdoing.

Two motions to dismiss are before the Court here.  As the motions overlap factually and

legally in several respects, the Plaintiffs are opposing both in this consolidated memorandum.

However, the motions also differ in several respects; thus, Plaintiffs will set forth the arguments

raised in each motion here as a reference:

a.    <u>WMC's Motion to Dismiss</u>

WMC argues predominately that it is not directly liable for the any of the allegations in

the Amended Complaint, and that the Amended Complaint does not sufficiently allege agency to

establish vicarious liability.  WMC seeks to dismiss *every claim*.  Much of its argument is based

on statute of limitations grounds, although the Chapter 93A and breach of the implied duty of

good faith and fair dealing claims are clearly within their respective limitations period.

b.    <u>Saxon's and Wells Fargo's Motion to Dismiss</u>

Saxon and Wells Fargo *do not seek to dismiss every claim*.  They do not seek to dismiss

Count III, the Chapter 93A claim, or Count VI, the claim for breach of the implied duty of good

faith and fair dealing.  Further, Wells Fargo does not offer any argument in support of a

dismissal of Count I, the claim against it under Chapter 140D.  Saxon, on the other hand, seeks

dismissal of the federal TILA claim and Chapter 140D claim by citing statutory provisions disclaiming servicer liability. Further, Saxon and Wells Fargo argue inadequate pleading and statute of limitations grounds to dismiss the fraud claim.

The three Defendants all share the common mistake of attempting to deny facts alleged in the Amended Complaint. This they cannot do in a motion to dismiss. Nothing in the United States Supreme Court's recent decisions touching upon the pleading standards has changed the rule that all well-pleaded facts are accepted as true for purposes of a motion to dismiss. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, *accepted as true*, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, No. 07-1015, 556 U.S. ___, Slip Op. at 14. (May 18, 2009) (attached hereto as Exhibit 1) (emphasis added), citing Twombly, 550 U. S., 544, 555 (2007).

## ii. Factual Background

In or around April 2004, WMC provided a first and second mortgage to the Chans secured by their residence, which increased the total indebtedness secured by the residence substantially. (See Amended Complaint, ¶8.) On or about December 22, 2004, less than eight months from the Chans' last mortgage transaction with WMC, a WMC representative telephoned Mr. Chan claiming that he could assist the Chans in saving hundreds of dollars per month by consolidating the two loans as one single mortgage with a forty-year term. (Id., ¶9.) The WMC representative asked Mr. Chan to provide him with a recent paystub and six months of banks statements to begin the refinancing process, which Mr. Chan did. (Id.)

After sending off his personal financial information, Mr. Chan did not hear anything from the WMC representative until April 2005. (Id., ¶10.) Unbeknownst to the Chans, however, WMC had further pursued its investigation into the Chans' finances. On February 15, 2005,

WMC requested the credit reports for Mr. and Mrs. Chan.  (See Affidavit of Calvin Chan ("Chan Aff."), ¶13 and Exhibit H attached thereto.)  This request was made without authorization by the Chans and prior to any loan application by them.[2]

On or about April 6, 2005, the WMC representative finally called Mr. Chan to discuss the terms of a proposed refinancing.  (See Amended Complaint, ¶10.)  The representative offered an adjustable rate of 6.2% for two years, for a $741,000, forty-year loan.  (Id.)  Mr. Chan told the representative to lock in the rate, and he provided, upon the representative's request, a copy of his W-2 for 2004 and his mortgage loan statements by facsimile that day.  (Id.)

On or about April 8, the WMC representative called Mr. Chan again to continue discussions over the refinance, and Mr. Chan told the representative that the two-year lock-in period was too short because the Chans' first mortgage rate was locked-in and would not change until June 2009.  (Id., ¶11.)  Mr. Chan also specifically advised the WMC representative that he was the only wage earner in his household and that Mrs. Chan was a homemaker.  (Id.).  Mr. Chan further advised the WMC representative that he would be the primary borrower on the refinance loan.  (Id.)

Following this conversation, WMC informed the Chans that they were approved for a forty (40) year adjustable rate mortgage secured by their primary residence in the amount of $741,000.  (Id., ¶12.)  WMC offered the Chans an interest rate of 6.25% for an initial period of three years with a monthly payment of $4,206.95.  (Id.)  The annual percentage rate ("APR") for the loan was represented to be 6.395%.  (Id.)  The loan was based on the appraised value of the residence of $780,000 which *constituted exactly a 95% loan to value ratio*.  (Id.)  WMC further represented to the Chans that the loan would fully amortize over the forty year loan term and that

---

[2] This fact is not alleged in the Chans' Amended Complaint, but it is not asserted to establish an element of any particular claim; rather it is asserted to establish WMC's direct involvement in the refinancing process that resulted in the predatory loan at issue.  To the extent that the Court finds this fact or any other additional facts raised herein that was not asserted in the Plaintiffs' Amended Complaint necessary to decide the pending motions, the Plaintiffs' request leave to further amend their complaint.

there would be no balloon payment.  (Id.)  The WMC representative confirmed to Mr. Chan that

he would state the committed terms on the loan application as well as on various disclosure

statements as required under federal and state law and send these to the Chans for their

signatures.  (Id., ¶13.)

WMC, through its representative, completed the loan application on behalf of the Chans.

(Id., ¶14.)  The representative interviewed Mr. Chan concerning the Chans' income, and Mr.

Chan reported that he had monthly income of approximately $8,800 which annualized to

approximately $106,000.  (Id..)  Mr. Chan further informed the representative that his wife did

not work and that he had no other household income.  (Id..)  Nonetheless, the representative

asked whether the Chans had any other corporations or business entities.  (Id..)  Mr. Chan did

disclose that he and his wife had formed a corporation to launch a possible business venture but

that the business venture had not proceeded.  (Id.)  The only verification of income requested of

the Chans and thereafter provided was a form W-2 for Mr. Chan for 2004 and a copy of a current

paycheck stub which reflected income consistent with the amount he reported to the mortgage

representative.  (Id.)

Inexplicably, and unbeknownst to Mr. and Mrs. Chan, the WMC representative

completed the loan application on April 8, 2005 reflecting income *for Mrs. Chan of $6,100*.  (Id.,

¶15; Chan Aff., ¶3 and Exhibit B attached thereto.)  The loan application was mailed to the

Chans the same day for their signatures together with related documents outlining the terms of

the loan commitment by WMC.  (Id.)  WMC *did not disclose* that it had changed the income on

the form and that the new information was false and fabricated.  (Id.)  The Chans executed the

loan application and related documents on or about April 12, 2005, unaware of the fictitious

income represented for Ms. Chan.  (Id.)  Several days later, a WMC representative called Mr.

Chan and indicated that WMC wished for Mrs. Chan to be designated as the "borrower" and Mr.

Chan the "co-borrower" because Mrs. Chan supposedly had a higher credit score.  (Id., ¶16.)

The attorney who worked with the Chans on the loan application and closing was

appointed by WMC.  (Id., ¶17.)  However, the attorney did not attend the closing, which

occurred on or about April 25, 2005, nor did a Notary Public.  (Id.)  The Chans were asked to

sign numerous documents at the closing without ever being advised to read them or asked if they

understood the documents that they were signing.  (Id.)  These documents and their contents

were not explained to the Chans at that time.  (Id., ¶25)  At the conclusion of the closing, the

employee of the attorney appointed by WMC provided the Chans with an executed copy of the

Federal Truth-In-Lending Disclosure Statement, Settlement Statement, Closing Instructions,

Adjustable Rate Note, Mortgage and Adjustable Rate Rider.  (Id., ¶18.)  The Chans also received

a copy (but not two copies) of the Notice of Right to Cancel, but the date of the refinancing

transaction and rescission date were blank on both Notices.  (Id.)  The Chans left the closing

believing reasonably that they had executed a forty-year (40) adjustable rate mortgage at 6.25 %

for three (3) years with an APR of 6.395 % and no balloon payment.  As explained below, they

only discovered the fraud when they had cause to examine the closing documents provided to

them by the WMC attorney both at and after the closing after problems arose with their

mortgage.

Either Saxon or WMC worked from an office in Texas on the closing and took part in the

fabrication of information on the loan documents.  This involvement is evidenced by the

facsimile time stamp on one of the several purported loan agreements.  The agreement, a copy of

which was produced to the Chans by Mortgage Electronic Registration Systems, Inc., the current

nominee for WMC according to its cover letter sent to the Chans counsel, is stamped with a

facsimile number with a 682 area code and a date of April 26, 2005, a day *after* the closing.  (See

Chan Aff., ¶9 and <u>Exhibit D</u> attached thereto.)  Upon information and belief, Saxon's principal

place of business is in Fort Worth, Texas.  (<u>See</u> Amended Complaint, ¶5.)  Also upon

information and belief, WMC had a place of a business in Addison, Texas, which is located near

Fort Worth, in 2005.  This Court can take judicial notice that the 682 area code includes Fort

Worth, Texas.  <u>See</u> <u>Fed.R.Evid.</u> Rule 201(b); <u>U.S. v. Deckard</u>, 816 F.2d 426, 428 (8th Cir. 1987)

(taking judicial notice of area code including address in question).  The fact that the facsimile

was sent from the 682 area code in Texas a day after the closing which occurred in

Massachusetts suggests that the document was not the same as that which was presented to the

Chans at the closing.  It certainly shows that the document was sent from a party located in

Texas, where both WMC and Saxon had offices.

On or about April 28, the Chans received copies of the remaining closing documents that

they had executed at the closing from the closing attorney's office.  (<u>Id.</u>, ¶19.)  Then on or about

May 7, 2005, they received a letter from the closing attorney's office asking that they sign an

enclosed "Balloon Rider."  (<u>Id.</u>)  This request came via a cover letter on WMC letterhead from

"Melissa Kabula, Post Closing" of WMC, specifically instructing the Chans to backdate the

Balloon Rider to April 25, 2005, the date of the closing.  (<u>Id.</u>; Chan Aff., ¶12 and <u>Exhibit G</u>

attached thereto.)  The Chans executed the Balloon Rider as requested and backdated it, unaware

of the significance of the document, which had specifically been excluded from the original loan

agreement, and that WMC had changed the terms of the refinancing loan at closing.  (<u>Id.</u>)

The Chans made mortgage payments of principal and interest in the monthly amount of

$4,233.10 from June 2005 to April 2008, and paid the property tax and insurance directly, which

totaled approximately $900 per month.  (<u>Id.</u>, ¶21.)  Throughout the years, the monthly payments,

including taxes and insurance, have well exceeded 50% of the Chans' gross income.  (<u>Id.</u>, ¶20.)

In or about June 2008, pursuant to the adjustable rate provision of the Note, the interest rate on

the loan was increased from 6.3% to 9.3%.  (Id., ¶22.)  As a result as well as due to personal

financial developments, the Chans were unable to make the exorbitant payments required to

service the loan and fell in arrears.  (Id., ¶20.)  The Chans were able to adjust the rate back to

6.3%, but personal financial issues compounded by the heavy mortgage payments caused the

Chans to fall into arrears again in November 2008.  (Id., ¶23.)

　　　　The Chans did not have any reason to suspect any fraud or misrepresentation in their loan

documents until their home was broken into by a home service worker engaged by Saxon who

was instructed to perform winterization to the house on the belief that it was vacant.   (Id., ¶24.)

After this incident, the Chans examined their loan documents closely and they realized that the

documents completed by the WMC representative contained numerous factual errors.  (Id., ¶25.)

Further and more importantly, the Chans discovered that they were not provided with all

disclosure statements as required under federal and state law and that the terms of the actual loan

advanced had significantly changed from the terms represented to them and agreed by them prior

to the closing. (Id., ¶25.)

　　　　For instance, the Uniform Residential Loan Application that the Chans received after the

closing was back-dated to February 15, 2005, and it reflected Mrs. Chan's monthly income as

$12,376.  (Id., ¶26; Exhibit D to Chan Aff.)  This despite the fact that Mr. Chan had repeatedly

represented to the WMC representative that Mrs. Chan did not work or generate any income.

(Id., ¶26.)  It was clear that WMC through its representative had intentionally falsified the loan

application to qualify the Chans for a mortgage that they could never otherwise qualify for or

pay.  (Id., ¶26.)  WMC clearly knew this information was inaccurate as the unauthorized

February credit check reflected that Mrs. Chan did not work.  (See Exhibit H to Chan Aff., at 19

for Mrs. Chan credit report (listing no employer) and 33 for Mr. Chan credit report (listing

employer).)  Further, Mr. Chan had always been told and provided a commitment by WMC that

the loan would be for a 480-month term at an interest rate of 6.25% for an initial three-year period that would fully amortize principal with no balloon payment. (<u>Id.</u>, ¶27.) In fact, the loan documents that they were coerced into executing were for a term of 360 months at an interest rate of 6.30% fixed for an initial three years plus a balloon payment in the final year of $490,832.84. (<u>Id.</u>, <u>Exhibit</u> <u>D</u> to Chan Aff.)

Based on a complete review of the loan documents, there were in fact only three (3) loan documents executed by the Chans on April 25, 2005 that reflected the correct terms of the loan as committed by the WMC representative on or about April 8, 2005. (<u>Id.</u>, ¶29.) These documents were:

    a.  The Massachusetts Mortgage Broker Disclosure Statement indicated the term of the loan was 40 years.

    b.  The Massachusetts – Addendum to the Uniform Residential Loan Application (URLA) FNMA 1003 indicated the approximate expiration date of the Note would be May 1, 2045 (40 years).

    c.  The Mortgage Lender Disclosures required by the Attorney General's Consumer Protection Regulations indicated no balloon payment at the end of the term. (<u>Id.</u>)

Further, the APR on the Federal Truth-in-Lending Statement was shown as 9.456%, whereas the APR committed to the Chans on April 8, 2005 by WMC was 6.395%. (<u>Id.</u>, ¶30.) The APR was further increased to 9.787% on the Massachusetts Mortgage Broker Statement. (<u>Id.</u>) None of these changes were disclosed to the Chans at closing. (<u>Id.</u>)

On or about February 25, 2009, after the Chans consulted with legal counsel, the Chans served the three Defendants with a Demand Letter pursuant to M.G.L. c. 93A, §§ 2 and 9. (<u>Id.</u>, ¶31.) None of the Defendants made a timely response to the Demand letter as required within

thirty (30) days.  (Id.)  Instead, the matter was referred by Wells Fargo to a law firm to begin

foreclosure proceedings.  (Id., ¶32.)  Prior to filing the lawsuit, counsel for the Chans was never

afforded the opportunity to speak with any representative of Saxon or Wells Fargo who had

authority to discuss a negotiation and resolution of the issues relating to the loan and foreclosure

proceedings.  (Id.)

On or about May 19, 2009, the Chans, through their counsel, received certain loan

documents from a law firm in Boston that Saxon engaged to initiate the foreclosure process.

(Id., ¶33.)  Included in the package were documents on which the Chans' signatures had been

forged and documents that had been altered after the Chans signed them, including the Notice of

Right to Cancel.  (Id.)  (See Chan Aff., ¶¶14-15 and Exhibit K attached thereto.)


### iii. Argument

#### a.        The Motion To Dismiss Standard

This Court must "accept the [Amended] [C]omplaint's well-pleaded facts as true and

indulge all reasonable inferences in the plaintiff's favor."  Elgin v. U.S., 594 F.Supp.2d 133, 137

(D. Mass. 2009), citing Cook v. Gates, 528 F.3d 42, 48 (1st Cir. 2008).  To survive a motion to

dismiss, a complaint must merely "allege a plausible entitlement to relief.."  Elgin, 594

F.Supp.2d at 137, citing Twombly, 550 U.S. at 570.  However, "a well-pleaded complaint may

proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a

recovery is very remote and unlikely."  Twombly, 550 U.S. at 555.

#### b.        15 U.S.C. § 1600, et. al./Chapter 140D (the Truth-In-Lending Act)

"The [Truth-in-Lending Act] requires creditors to make clear and accurate disclosures of

terms dealing with things like finance charges, annual percentage rates of interest, and the

borrower's rights."  Belini v. Wash. Mut. Bank, FA, 412 F.3d 17, 20 (1st Cir. 2005), citing Beach

v. Ocwen Fed. Bank, 523 U.S. 410, 412 (1998).  "Congress enacted the TILA in 1968 to assure a meaningful disclosure of credit terms and to protect the consumer against inaccurate and unfair credit . . . practices."  See McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 421 (1st Cir. 2007) (ellipses in original).  The Federal Act, 15 U.S.C. § 1600, et. al., and the Massachusetts counterpart, Chapter 140D, are virtually identical except for the statutes of limitations.  Id. at 422.  Under the federal act, the right of rescission is extended to three years if adequate disclosures are not made.  See 12 C.F.R. § 226.23(a).  Under the state act, the right of rescission is extended without adequate disclosures to four years.  See M.G.L. c. 140D, § 10(f).  Similarly, the federal act provides a one year statute of limitations period for damages actions, assuming no tolling.  See 15 U.S.C. § 1640(e).  Chapter 140D has a four year statute of limitations period for damages actions.  See M.G.L. c. 260 § 5A.

The second important distinction for the purposes of this action is the Massachusetts exemption under the federal TILA.  Massachusetts is exempt from certain parts of the federal regulatory scheme as a result of having its own TILA statute.  See 12 C.F.R. § 226.29.  Thus, a Massachusetts resident can bring a claim for damages under § 1640 of TILA and Chapter 140D; however it remains an unsettled question whether a Massachusetts resident can bring a rescission claim under § 1635 of TILA due to the regulatory exemption.  See Palmer v. Champion Mortg., 465 F.3d 24, 27 (1st Cir. 2006); Desrosiers v. Transamerica Fin. Corp. (In re Desrosiers), 212 B.R. 716, 722 (Bankr.D. Mass. 1997).  This question is not significant for this opposition, because the Chans' claim for rescission under Chapter 140D is within the four year statute of limitations (as is their claim for damages under Chapter 140D).

TILA extends liability to assignees of loans both for rescission and damages.  A borrower's right of rescission follows directly to an assignee without conditions.  See M.G.L. c. 140D, § 33(c); Myers v. Federal Home Loan Mortgage Co. (In re Myers), 175 B.R. 122, 126

12

(Bankr. D. Mass. 1994).  In addition, a borrower can claim damages under TILA against an assignee provided that the violations are apparent on the face of the disclosure documents.  See McDermott v. Mortgage Elec. Registration Sys., No. 08-12121, 2009 U.S. Dist. LEXIS 39691, *9-19, (D. Mass. May 11, 2009) (attached hereto as Exhibit 2); M.G.L. c. 140D, § 33.  A borrower can also recover damages under TILA based solely on a lender's failure to provide the required number of rescission Notices.  See Myers v. Federal Home Loan Mortgage Co. (In re Myers), 175 B.R. 122, 127 (Bankr.D. Mass. 1994) (citing M.G.L. c. 140D § 10(g), "In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section thirty-two not relating to the right to rescind."); Belini v. Wash. Mut. Bank, FA, 412 F.3d 17, 25 (1st Cir. 2005) ("Section 1640 allows damages actions to be brought against any creditor who fails to comply with *any* requirement imposed under this part, including any requirement under section 1635 of this title.") (emphasis added).  In other words, failure to deliver the required number of copies of the Notice of Right to Cancel provides a right of rescission as well as a claim for damages.

Finally, Chapter 140D provides that any violation of its statutory provisions is a *per se* violation of Chapter 93A.  See M.G.L. c. 140D, § 34.

**b.     The Claims Against Each Defendant**

**i.      Defendant WMC**

WMC has violated Chapter 140D and the 15 U.S.C. § 1635 through its direct participation in the predatory loan refinancing of the Chans' mortgage.  The most obvious violation by WMC is its failure to deliver the required number of rescission Notices to the Chans.  (See Amended Complaint, ¶18.)  Such a violation of Chapter 140D is a *per se* violation of Chapter 93A.  See M.G.L. c. 140D, § 34.  Further, many disclosures provided to the Chans prior to the closing were glaringly inaccurate, which establishes the damages claim under

13

Chapter 140D and the claim for fraud.  The loan also bears all the features of what that the

Supreme Judicial Court recently found to constitute a predatory lending scheme and a violation

of Chapter 93A.  See Commonwealth v. Fremont Investment & Loan, 452 Mass. 733, 751

(2008).

To the extent that the statute of limitations for any of the Chans' claims has run, the

discovery rule and the fraudulent concealment doctrine should apply to preserve these claims.

### ii.      Defendant Wells Fargo

As an initial matter, Wells Fargo (like Saxon, see supra) has not moved to dismiss the

Chans' claims under Count III for violation of Chapter 93A and Count VI for breach of the

implied duty of good faith and far dealing.  These claims thus should remain regardless of the

disposition of this Defendant's motion to dismiss.  Further, Wells Fargo has not offered any

argument to support dismissal of the Chans' claim under Count II for violation of Chapter 140D.

Wells Fargo is liable as an assignee of WMC both for rescission and for damages.

Therefore, the actions of WMC described herein equate to actions of Wells Fargo for those

claims stated adequately against WMC.  Wells Fargo waived its motion to dismiss the Chapter

140D damages and rescission claim by failing to offer any arguments regarding that claim.

Further, its arguments that the statutes of limitations have run on the federal TILA, negligence,

and misrepresentation claims fail due to the discovery rule and the fraudulent concealment

doctrine.  The economic loss doctrine also does not apply here to the Chans' negligence claim as

that claim arises out of a contractual relationship and properly states a negligent

misrepresentation claim.

### iii.      Saxon

Saxon (like Wells Fargo) does not move to dismiss Count III for violation of Chapter

93A and Count VI for breach of the implied duty of good faith and fair dealing.   Similarly, its

arguments regarding the Chans' claims for negligence, misrepresentation, and the economic loss

doctrine are identical to Wells Fargo's as described above.  However, the Chans do not oppose

Saxon's motion to dismiss Counts I and II, solely as those claims apply to Saxon.[3]


1.    **WMC Is Liable Directly and Vicariously For Its Involvement In The Scheme To Commit The Chans To A Loan They Could Not Afford.** [4]

   a.    **WMC Directly Engaged In The Unlawful Conduct Leading To The Predatory Loan.**

WMC cannot hide from its active participation in the scheme to bind the Chans to a loan

that they could not afford under terms to which they never intended to agree.  WMC was always

the exclusive lender working with the Chans, from their initial two mortgage loans in 2004 to the

refinance loan at issue here in 2005.  (See Amended Complaint, ¶¶7-10.)  Its position that

"WMC is not liable for Northside's alleged acts" (Mtn. to Dismiss, at 9) ignores its very own

deceptive actions that contributed to the Chans' injury.  The Chans do not need to establish an

agency relationship between Northside and WMC to show WMC's liability here.

WMC constructed a loan transaction for the Chans without any consideration for their

earning capacity or their desired loan terms.  This much is evident by the chronology of events.

The Chans and the WMC representative did not begin discussing loan terms until early April

2005.  (Id., ¶10.)  However, WMC requested credit reports for Mr. and Mrs. Chan on February

15.  (See Chan Aff., ¶13 and Exhibit H attached thereto.)  This action was unauthorized and,

regardless of whether it strictly violated the law, the action demonstrates the direct engagement

by WMC in the Chans' refinancing.  Indeed, the credit check was a significant act as it likely

demonstrated Mr. Chan's lack of credit worthiness to assume a 95% loan-to-value mortgage,

---

[3] Assuming the Court dismisses Counts I and II against Saxon, the Chans request that said dismissals be without prejudice as discovery may reveal facts that support claims against Saxon under those theories.

[4] This section applies to Wells Fargo inasmuch as it is liable for the acts of WMC as an assignee.

particularly in reliance on over $144,000 of nonexistent income from Mrs. Chan.  The credit

report reveals that Mrs. Chan was unemployed – consistent with the information provided by Mr.

Chan.  (Amended Complaint, ¶12.)  Nonetheless, Mrs. Chan was added to the loan document as

the primary borrower, supposedly because she had a better credit score, and a fabricated income

for her was added to increase the Chans overall earning capacity and make them appear to

qualify for the loan. (Id., ¶16.)  Clearly, WMC knew or should have known in underwriting the

loan that the information concerning Mrs. Chan's alleged income was suspect at best.

     The second key involvement by WMC was its appointment of the lawyer for the closing.

(Id., ¶17)  The closing occurred at the lawyer's office, the Law Offices of Robert Babchuk, P.C,

even though the lawyer himself did not appear.  (Id.)  A member of the lawyer's office staff

worked with the Chans at the closing by rushing them through the documents and instructing

them to sign each one without explaining the significance of the documents or the fact that the

terms had been changed in many of them.  (Id.)  The disclosures of the misrepresented loan

terms – including the TILA statement and the Settlement Statement -- were provided to the

Chans by the lawyer's employee at the closing. (Id., ¶18.)  Thus, WMC's lawyer was

instrumental, indeed, the critical player in: 1) providing the Chans with false disclosure

information about the terms of their loans, and 2) fraudulently concealing the bait and switch by

encouraging the Chans to sign their loan documents at the closing without reviewing them first

and without explaining what they were signing.  In this way, WMC directly *caused* the

fraudulent loan to be executed.

     WMC's deceptive conduct continued after the closing.  On May 3, Melissa Kabula from

WMC wrote to the closing lawyer's office on WMC letterhead forwarding a copy of the Balloon

Rider.  (Id., ¶19; Chan Aff., ¶12 and Exhibit G attached thereto.)  Ms. Kabula directed that the

Balloon Rider be sent to the Chans with instructions that they execute and backdate the rider to

April 25, 2005.  (Id.)  WMC's representative had specifically represented to the Chans in early

April, however, that the loan would not include a balloon payment.  (Id., ¶12.)   Indeed, the

Mortgage Lender's Disclosure provided to the Chans at the closing indicated that there was no

balloon payment at maturity.  (See Chan Aff., ¶11 and Exhibit F attached thereto.)  This resulted

in the Chans agreeing, unknowingly and without intention, to a loan whereby they obligated

themselves to make a one-time payment of $490,832.84 on May 1, 2035.  This also conflicted

with the Massachusetts Mortgage Broker's Statement and the Massachusetts Addendum to the

Uniform Residential Loan Application, both of which reflected a forty-year term and a maturity

date in 2045, not 2035.  (See Chan Aff., ¶¶9-10 and Exhibits D and E attached thereto.)

Finally, perhaps most striking about WMC's opposition is what it *does not say*.  WMC

does not deny that the terms of the Chans' loan refinancing differed substantially from those that

were originally represented to the Chans; WMC does not deny that Mrs. Chan's income was

fabricated on the loan documents; WMC does not even deny that the loan was predatory in

nature.

**b.      WMC Is Liable Vicariously Through The Actions Of Its Agent Northside.**

The Plaintiffs have also pled sufficient facts to establish vicarious liability for WMC

through the actions of Northside.  WMC's argument that "a broker in a loan transaction is not

deemed a lender's agent absent specific allegations describing an agency relationship" is based

on an inaccurate case citation.  (See Mtn to Dismiss, at 8.)  WMC cites to In re Sullivan, 346

B.R. 4 (Bankr.D. Mass. 2006), which was decided on *summary judgment*.  Id. at 27.  The

standard that this Court applies to the Defendants' motions to dismiss the Chans' Amended

Complaint is far different.  See Elgin., 594 F.Supp.2d at 137 (the Court "must accept the

complaint's well-pleaded facts as true and indulge all reasonable inferences in the plaintiff's

favor.")

The Amended Complaint alleges that Northside was a "representative" of WMC. (Amended Complaint, ¶7.)  The Amended Complaint further alleges that when the representative contacted the Chans in December 2004, he offered refinancing through WMC rather than a range of lending institutions as brokers typically do.  (Id., ¶9.)  The Amended Complaint also alleges that the WMC representative made a firm offer to lock-in an adjustable interest rate of 6.2% for two years initially, thus binding WMC, the lender.  (Id., ¶10.)  WMC denies these allegations by offering the Mason Declaration and its Broker Origination Agreement with Northside.  (See Mtn. to Dismiss, at 8, and accompanying Exhibit C.)  Such an offer of evidence in rebuttal to allegations in a complaint is unresponsive at the motion to dismiss stage and must be disregarded.  At best for WMC, the issue of whether Northside was acting as an agent for WMC is a fact question that must be resolved in the Chans' favor at the motion to dismiss stage. See Smith v. Jenkins, 626 F. Supp. 2d 155, *17 (D. Mass. 2009) (denying motion to dismiss that argued lack of agency relationship because "[t]he existence and extent of an agency relationship is ordinarily a question of fact to be decided by a jury").

Moreover, beyond its vicarious liability through Northside, WMC is vicariously liable for the actions of the closing attorney.  The Chans allege, first, that the closing attorney was appointed for them by WMC.  (Id., ¶17.)  They further allege in the Amended Complaint that they only received one copy of the Notice of Right to Cancel at the closing, which occurred at the closing attorney's office.  (Id., at ¶18.)  Further, the Chans allege that the employee at the closing attorney's office purposefully rushed them through the documents and instructed them to sign the loan documents without reading them.  (Id., at ¶17.)  Finally, the Chans allege that they received the Balloon Rider with instructions to backdate it from the closing attorney's office. (Id., ¶19.)   The failures of WMC to comply with the requirements of the federal TILA and Chapter 140D, such as the failures to provide sufficient copies of the Notice of Right to Cancel

and to provide accurate information in these documents, are undisputed violations of these provisions by WMC as a lender – regardless of which agent acted on its behalf.

**2.      The Statutes of Limitations For Counts II, IV, and V Were Tolled Under The Discovery Rule And/Or The Doctrine Of Fraudulent Concealment.[5]**

None of the Chans' claims accrued until January 2009 when their house was broken into by a home service worker employed by Saxon instructed falsely that the house was vacant. (Id.,¶24.)  Until then, they had no reason to inquire or investigate any claims regarding their loan with WMC and/or Wells Fargo.

**a.      The Discovery Rule**

In determining when a claim accrues, this Court "look[s] first to whether sufficient facts were available to provoke a reasonable person in the plaintiff's circumstances to inquire or investigate further."  McIntyre v. U.S., 367 F.3d 38, 52 (1st Cir. 2004); In re Pharmaceutical Indus. Avg. Wholesale Price, 491 F.Supp.2d 20, 77 (D. Mass., 2007).  Under the discovery rule, as applied in Massachusetts, "a cause of action does not accrue until the plaintiffs know or reasonably should have known that they were injured as a result of the defendant's conduct." Cornell v. E.I. Dupont de Nemours & Company, 841 F.2d 23, 24 (1st Cir.1988); Coady v. Marvin Lumber and Cedar Co., 167 F.Supp.2d 166, 172 (D. Mass., 2001).  The discovery rule tolls the statute of limitations in the Chans' claim under the federal TILA and their fraud and negligence claims against all Defendants.  This is because the injury for each of these claims is

---

[5] WMC also makes a half-hearted argument that the Chapter 93A claim is outside the statute's four-year statute of limitations period because the claim is purportedly based on a loan application signed on April 12, 2005.  (See WMC Mtn. to Dismiss at 11.)  The Chans' 93A claim against WMC is based on far more factual allegations than a loan application, however, such as, *inter alia*: 1) the *knowing and willful use of a loan application with false information inserted by WMC to qualify the Chans for a loan that they could not afford*; 2) providing the Chans with fraudulent disclosure statements; and 3) actively concealing the fraudulent disclosure statements.  Further, the Chans suffered no damage the deceptive acts until after the closing and, therefore, at the earliest, the cause of action under Chapter 93A did not accrue until the closing occurred (and, more likely, the statutory rescission period expired).  Thus, the Chapter 93A claim is clearly timely.  See Dwyer v. Barco Auto Leasing Corp., 903 F. Supp. 205, 211 (D. Mass. 1995) (cause of action for Chapter 93A accrues at time of injury).

identical, and the Chans "did not know or reasonably should have known that they were injured as a result of the [Defendants] conduct" until the January 2009 break-in.  Id.

Indeed, courts have held that under the discovery rule the statute of limitations was tolled in previous cases where injury results from unknown terms in loan documents.  The Massachusetts Superior Court recently denied a lender's motion to dismiss a borrower's Chapter 93A claim based on the discovery rule in a nearly identical factual situation as here.  In Damas v. Mortgage Electronics Registration Systems, No. 08-2207, 2009 Mass. Super. LEXIS 156 (June 3, 2009) (attached hereto as Exhibit 3.), the plaintiff asserted that he never agreed to the adjustable rate mortgage at issue, and thus when his rate increased he could not make the monthly payments.  Id. at *2.  Although the plaintiff filed his Chapter 93A claim more than four years after the closing of his loan, the Superior Court ruled that the discovery rule tolled the statute of limitations and preserved his claim.  Id. at *4-5, citing Koe v. Mercer, 450 Mass. 97, 101 (2007).  The Superior Court focused on the date when the adjustable rate was increased, leading to the plaintiff's inability to make the mortgage payments.  Id. at *5.  As the Court explained, "The defendant argues time began to run when the loan closed on October 17, 2003. . . . The discovery rule is broader than the defendants' position."  Id. at *4-5.

As in the Damas case, the Chans' claims did not accrue at the closing.  That is because the Chans did not have "1) knowledge or sufficient notice that [they were] harmed *and* (2) knowledge or sufficient notice of what the cause of harm was."  Bowen v. Eli Lilly & Co., 408 Mass. 204, 209 (1990) (emphasis added).  The Chans were inundated with documents between April 8 and May 7, 2005. (See generally Chan Aff.)  The affidavit offered by Mr. Chan only sets forth a sample of the multitude of such documents.  Culling through these documents to locate all the significant terms and ensure that all such terms were consistent throughout was not reasonably expected for a consumer, particularly when the Chans were instructed at the closing

to simply sign the documents without reading them.  Moreover, determining the reasonableness of the Chans' knowledge is a fact question that precludes dismissal.  See Koe, 450 Mass. at 102 (2007) ("an issue concerning what the plaintiff knew or should have known is a factual question that is appropriate for the trier of fact."); Sullivan, 346 B.R. at 26 (rejecting application of the discovery rule *but at summary judgment,* following deposition testimony by the plaintiff).

The Amended Complaint alleges that the Chans' were asked to sign numerous documents at the April 25, 2005 closing without any explanation or being asked to read them.  (Amended Complaint, ¶17.)  Thus, as in Damas, the time for the Chans' claim did not begin to run at the closing on April 25, 2005, but when they "kn[e]w or reasonably should have known that they were injured as a result of the defendant's conduct."  Cornell v. E.I. Dupont de Nemours & Company, 841 F.2d 23, 24 (1st Cir. 1988).  That did not occur until their house was subsequently broken into by a worker hired by Saxon in January 2009 and they became concerned about the actual terms of their loan.  (See Amended Complaint, ¶¶24-25.)  Until that time, they had been misled by the WMC appointed attorney into believing that their loan was closed based on the same terms previously presented and explained to them.  When the break-in incidence caused them to re-examine the actual loan terms, they discovered a maze of inconsistent, false and incomplete applications, disclosures and loan documents.  (See generally Chan Aff.)  Even then, it was only with the assistance of counsel that they were able to determine that they had valid causes of action against these Defendants.

### b.  Fraudulent Concealment

The statutes of limitations for the Chans' claims under federal TILA and for fraud/misrepresentation also are also tolled under the doctrine of fraudulent concealment.  Under Massachusetts law, "[i]f a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the

discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action." M.G.L. c. 260, § 12. Saxon is incorrect that fraudulent concealment cannot be claimed when "all information necessary for Plaintiffs to discovery their purported tort claims was in their possession from the time they entered into the loan agreements." (See Wells Fargo/Saxon Mtn. to Dismiss, at 6.). Massachusetts courts only attribute knowledge to a plaintiff in a case of active concealment "in circumstances where the probability of wrongdoing was so evident that possession of the means was equivalent to actual knowledge." Demoulas v. Demoulas Super Mkts., 424 Mass. 501, 520 n. 25 (1997), citing Lynch v. Signal Finance Co., 367 Mass. 503, 508 (1975) (failing to provide required disclosures under TILA not fraudulent concealment). The probability of wrongdoing was not so evident here. In fact, the phalanx of conflicting, false, and incomplete documents surrounding the Chans' loan are difficult to understand and reconcile even with the assistance of counsel.[6]

The Demoulas Court cited the Lynch v. Signal Finance Co. decision to distinguish between active concealment and simply failing to provide required information when the information was already known to the plaintiffs. The lenders in Lynch did not actively conceal information, as WMC did, but simply failed to provide the required disclosure statements. Id. at 508. The Lynch borrowers knew the terms of the loan, in fact, and therefore failure to provide the disclosures simply may have required "mathematical computations from known data." Id. This contrasts markedly with the present matter where WMC willfully and knowingly concealed the loan terms that had been altered from the terms that were represented previously to the Chans.

---

[6] In fact, the events surrounding the closing suggest that there was no attempt by the Chans' WMC appointed counsel to explain or reconcile clearly conflicting legal documents. The Chans, relying on the superior knowledge and expertise of counsel, were asked to execute documents at the closing they now know reflected no balloon payments but twelve days later were asked by the same counsel to sign and backdate a "Balloon Rider" without any explanation whatsoever other than the suggestion that these were routine documents consistent with the terms of the closing.

Fraudulent concealment under federal law differs slightly than under M.G.L. c. 260, § 12, and to the extent this Court applies the federal doctrine to the federal TILA claim, that doctrine should still apply to toll the Chans' federal claim.  Under this standard, the statute of limitations is tolled "where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part . . . until the fraud is discovered."  <u>Maggio v. Gerard Freezer & Ice Co.</u>, 824 F.2d 123, 128 (1st Cir. 1987) (ellipses in original); <u>see</u> <u>Bennett v. United States</u>, 429 F. Supp. 2d 270, 281 (D. Mass. 2006) ("[I]n order for a plaintiff to prevail on a fraudulent concealment claim, the defendant must have engaged in fraud or deliberate concealment of material facts relating to his wrongdoing and the plaintiff must have failed to discover these facts within the normal limitations period despite his exercise of due diligence.")  The Chans' claims are tolled under this standard as well as only "reasonable diligence" is required.  <u>Id.</u>  As the First Circuit explained, it is "'storm warnings' of the possibility of fraud [that] trigger a plaintiff's duty to investigate in a reasonably diligent manner."  No such "storm warnings" occurred until the January 2009 break-in by the Saxon home service employee.

These storm warnings did not occur until then because the Chans were overwhelmed with confusing documents throughout the refinancing process with WMC and were purposefully rushed through the loan documents at the closing by the WMC attorney.  (<u>See</u> Amended Complaint, ¶17.)  The loan documents presented at the closing had been substantially altered from the terms as represented to the Chans previously and these changes were not explained.  (<u>Id.</u>)  The Chans were *instructed* to sign the documents without reading them. (<u>Id.</u>)  It is true also that the Chans received a "Balloon Rider" from WMC and signed it several days after the closing, but this does not evidence knowledge by the Chans, only further evidence of the deception by WMC.

Further, the Chans received new loan documents on May 19, 2009 with forged signatures that they had never seen before or possessed.  (Id., ¶33.; Chan Aff., ¶16.)  They had no means of discovering these documents and the misrepresentation of the forged signatures prior to receiving these documents.  As explained in the Chan Affidavit, the only loan application the Chans possessed up until that date was an unexecuted copy provided to them by the WMC attorney.  (Chan Aff., ¶9.)

The issue is not whether the Chans signed the loan documents and the disclosures – that is not denied – but that WMC took advantage of its far superior bargaining power to materially alter the Chans' loan without informing the Chans prior to the closing.  When a contract is procured by fraud, the presumption that a party read the contract and has agreed to its terms is extinguished.  See Bates v. Southgate, 308 Mass. 170, 183 (Mass. 1941); Commerce Bank & Trust Co. v. Hayeck, 46 Mass. App. Ct. 687, 692 (Mass. App. Ct. 1999) ("One party cannot enforce a contract against another whose signature he has procured by fraud or fraudulent representations, which induced the signer reasonably to believe and understand that the instrument was substantially different from what it really was.").

**3.    The Plaintiffs Alleged Sufficient Facts To Establish Claims Under M.G.L. c. 140D And 15 U.S.C. § 1600, et al. Against Wells Fargo And WMC.[7]**

> **a.    The Chans Sufficiently Alleged A Right To Rescission By Alleging That WMC Failed To Provide The Required Copies Of The Notice Of Right To Cancel.**

The Chans allege several violations of the requirements of the Notice of Right to Cancel to establish a claim for rescission under Chapter 140D and damages under Chapter 140D and 15 U.S.C. § 1640 against WMC and Wells Fargo.  (As stated previously, Wells Fargo's liability here is as an assignee, and WMC's actions are imputed to Wells Fargo for those purposes.)

---

[7] As explained supra at 3, Wells Fargo has moved to dismiss Chapter 140D, but did not offer any arguments to support dismissal of that claim.  The Plaintiffs include Wells Fargo here for completion sake.

WMC not only provided a Notice of the Right to Cancel without a date for the dates of closing and rescission, but also only provided one copy. (Amended Complaint, ¶18). Where both Mrs. and Mr. Chan were borrowers on the loan and owners of the residence held in security, Chapter 140D requires each to receive two copies, and thus four copies of the Notice of Right to Cancel to be provided in total. See 209 C.M.R. 32.23; see also 12 C.F.R. 226.23. This constitutes a material violation of Chapter 140D and provides the Chans with the right of rescission.

The United States Bankruptcy for the District Court of Massachusetts has ruled that the failure to provide the required number of Notices is a material violation of Chapter 140D that triggers the right of rescission. See Jaaskelainen v. Wells Fargo Bank, N.A. (In re Jaaskelainen), 391 B.R. 627, 644 (Bankr.D. Mass. 2008). This holding has been reviewed and affirmed by the District of Massachusetts. See Wells Fargo N.A. v. Jaskelainen, 407 B.R. 449, *19 (D. Mass, 2009).[8] In Jaskelainen, the two debtors established that they only received two copies of the Notice of Right to Cancel, not the required four. Id. The Court ruled that this constituted a violation of Chapter 140D, the lender had not made a "bona fide error" which would be excused under the law, and thus the debtors were entitled to rescission. Jaskelainen, 391 B.R. at 644-45.

Jasklenainen and the Chans' case do not differ. This Court must accept as true the allegation that the Chans only received one copy of the Notice of Right to Cancel. It does not matter that WMC offered through the Manson Declaration a purported signed copy of the Notice of Right to Cancel, one each for Mr. and Mrs. Chan.[9] Regardless, Mr. and Mrs. Chan are *each* entitled to two copies of the Notice of Right to Cancel. Id.

---

[8] The District Court affirmed the Bankruptcy Court's holding that the failure to deliver the correct number of copies of the Notice was a violation of Chapter 140D entitling the borrowers to rescission, but reversed the bankruptcy court's rescission order on other grounds.

[9] As alleged in the Amended Complaint, ¶18, these Notices were altered after the Chans signed them by adding the start and ending dates for the right of rescission. These dates were blank on the copies of the documents that the Chans actually signed as provided to them at the closing.

WMC argues strenuously that a blank date on the Notice of Right to Cancel does not create a material violation.  (See Mtn to Dismiss, at 10.)  However, WMC ignores the second noncompliance regarding the notice requirement under Chapter 140D alleged in the Amended Complaint.  It has offered no argument that the failure to deliver the required four copies – two to each borrower – of the Notice of Right to Cancel is not a material violation of Chapter 140D, and the Jaskelainen decision establishes that this is indeed a material violation.  The statute of limitations under Chapter 140D is four years, thus this claim is timely and WMC's motion to dismiss it should be denied.  See M.G.L. c. 140D, § 10.

> **b.    The Plaintiffs Sufficiently Alleged A Damages Claim Under Chapter 140D and 15 U.S.C. § 1600, et. al. Against WMC And Wells Fargo Through The Failure To Send The Required Rescission Notices And The Various Inconsistencies In The Loan Documents.**

The Plaintiffs' claim for damages against WMC and Wells Fargo under Chapter 140D and 15 U.S.C. § 1640 is established both by the failure to provide the correct number of Notices and by the substantial amount of false material information in the loan documents.[10]  The failure to send the required number of Notices states a claim for damages in itself.  See 12. C.F.R. 226.23; M.G.L. c. 140D § 10(g) ("In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section thirty-two not relating to the right to rescind.")

Moreover, WMC, and Wells Fargo as its assignee, violated Chapter 140D and the Federal TILA through the numerous inaccuracies in the disclosure statements.  (See Amended Complaint, ¶¶18, 25.)  These inaccuracies were clear on the face of the documents to sophisticated lenders such as these two Defendants.  For instance, the Mortgage Broker's Disclosure, signed on April 8, 2005, specifically stated that the loan "*will not*" have a balloon

---

[10] As explained supra at 19-21, the Plaintiffs claims under the federal TILA are preserved through the discovery rule and the fraudulent concealment doctrine, despite the statute's one-year statute of limitations.

payment, and that the introductory rate would be 6.25%.  (See Chan Aff., ¶4 and Exhibit A.)

The APR represented to the Chans on the Mortgage Broker's Disclosure was 6.395%, but it

turned into 9.456% on the Federal Truth-In-Lending-Statement, and then 9.787% on the

Mortgage Broker Statement, and these changes were never disclosed to the Chans.  (Id.;

Amended Complaint, ¶30.)

4.      **The Plaintiffs Have Alleged Sufficient Facts To Establish A Chapter 93A Claim Against WMC.[11]**

By alleging a violation of Chapter 140D, the Plaintiffs alleged sufficiently a Chapter 93A

claim against WMC.  As a matter of law, a violation of Chapter 140D establishes Chapter 93A

liability.  See M.G.L. c. 140D, § 34 ("A violation of this chapter, or any rule or regulation issued

hereunder, shall constitute a violation of chapter ninety-three A."); Vincent v. Ameriquest Mortg.

Co. (In re Vincent), 381 B.R. 564, 573 (Bankr.D. Mass. 2008) ("If [the plaintiff] is successful on

a claim under MCCCDA, then as a matter of law, she will prevail under chapter 93A.")  WMC

cites to Riccio v. Ford Motor Credit Co., 238 F.R.D. 44, 46 (D. Mass. 2006) and Section 3 of

Chapter 93A to argue that Chapter 93A does not apply when its actions have otherwise complied

with federal or state law.  (See Mtn. to Dismiss, at 12.)  This argument is a tautology.  The Chans

have alleged sufficient facts to establish a claim that WMC violated Chapter 140D and the

federal TILA; therefore a Chapter 93A claim is also stated.[12]

Regardless of the claim of a *per se* Chapter 93A violation resulting from the Chapter

140D violation, the Chans alleged facts establishing a predatory lending scheme that constitutes

an unfair and deceptive business act under Massachusetts law.  The loan-to-value ratio on the

loan was 95%.  (See Amended Complaint, ¶12.)  When the interest rate increased to 9.3% in

---

[11] As explained supra at 14-15, Defendants Wells Fargo and Saxon have not moved to dismiss the Chapter 93A claim.

[12] M.G.L. c. 93A, § 3 also places the burden of proof to prove compliance on the party claiming compliance with the law.

2008, the monthly payments represented over 80% of the Chans' pre-tax income at the time of

the closing.  (See Chapter 93A Demand Letter at 3, attached to Amended Complaint.)  Loan

terms such as these have been deemed by the Supreme Judicial Court to be "presumptively

unfair" and a violation of Chapter 93A.  See Commonwealth v. Fremont Investment & Loan, 452

Mass. 733, 751 (Mass. 2008).  The Supreme Judicial Court in Fremont affirmed a Superior Court

decision by then Superior Court Justice, now Supreme Judicial Court Judge Ralph D. Gants

through which he issued a preliminary injunction against Fremont Investment & Loan over its

predatory lending practices.  Judge Gants ruled that Fremont's loans with a combination of the

following four factors were likely to violate Chapter 93A:

> (1) the loans were ARM loans with an introductory rate period of three years or
> less; (2) they featured an introductory rate for the initial period that was at least
> three per cent below the fully indexed rate; (3) they were made to borrowers for
> whom the debt-to-income ratio would have exceeded fifty per cent had Fremont
> measured the borrower's debt by the monthly payments that would be due at the
> fully indexed rate rather than under the introductory rate; and (4) the loan-to-value
> ratio was one hundred per cent.

Id. at 747; Commonwealth v. Fremont Investment & Loan, No. 07-4373-BLS1, 2008 Mass.

Super. LEXIS 46, *29-30 (Feb. 25, 2008) (attached hereto as Exhibit 4).  The Supreme Judicial

Court agreed with Judge Gants that the "Attorney General is likely to succeed on her claim that

Fremont's practice of originating loans bearing the particular combination of four features

identified in the preliminary injunction was unfair."  Fremont, 452 Mass. at 750.

The loan to the Chans includes these four features (their loan-to-value ration is 95 percent

rather than 100 percent).  Regardless of whether the four features are individually appropriate or

lawful, "[i]t was [WMC's] choice to combine them into a package that it should have known was

doomed to foreclosure."  Id.  In fact, this type of deceptive business practices in the predatory

lending context has been recognized elsewhere than the Fremont decision:

> the Plaintiff has set forth allegations of affirmative conduct in that the Defendant's
> employee knowingly and fraudulently filled out the Plaintiff's loan application in

order to have the Plaintiff enter into a transaction she could not afford. If ultimately proven to be true, such behavior, in addition to potentially constituting actual fraud, falls squarely within the ambit of Chapter 93A § 2.

Vincent v. Ameriquest Mortg. Co. (In re Vincent), 381 B.R. 564, 574 (Bankr.D. Mass. 2008).

Further, the Chans allege that they received on May 19, 2009 various copies of loan documents from Saxon's law firm that included a purported loan application with forged signatures of Mr. and Mrs. Chan as well as other purported loan documents on which terms had been altered after the Chans had signed them.  (See Amended Complaint, ¶33; Chan Aff., ¶¶15-16 and Exhibits J and K attached thereto.)  Most of these loan documents have a printed date of February 15, 2005 for the date of the interview with the Chans.  That date is utterly false, as the interview with Mr. Chan where he first discussed the terms of the loan did not take place until April 6, 2005.  (See Amended Complaint, ¶10.)  The February 15 date is significant, because it is the same date that WMC requested the credit reports for Mr. and Mrs. Chan.  (See supra at 5; Chan Aff., ¶13 and Exhibit H attached thereto.)  It appears that the loan documents were falsely dated so that WMC could use them to check Mr. and Mrs. Chans' credit history prior to their actual loan application date.

The Chans, through counsel, served WMC with a Demand Letter pursuant to Chapter 93A, §§ 2 and 9, on or about February 25, 2009, but WMC did not timely respond.  (See Amended Complaint, ¶31.)

**5.    The Plaintiffs Alleged Sufficient Facts To Establish A Claim For Fraud Against All Three Defendants.**

    **a.    WMC's and Wells Fargo's Fraud**

The Chans' Amended Complaint easily satisfies the heightened pleading requirements for a claim of fraud against Wells Fargo and WMC.  See Fed.R.Civ.P. Rule 9.  The Amended Complaint sets forth the who, what, where, and when required for a fraud claim against WMC.

And as previously stated, Wells Fargo is liable as the assignee of WMC for any inaccuracies in the disclosures that were apparent on the face of the documents.  See M.G.L. c. 140D, § 33; 15 U.S.C. § 1641(e).  Thus, Wells Fargo can be held liable for a claim of fraud arising out of intentional misrepresentations in these disclosures.  See Walker v. Wallace Auto Sales, 155 F.3d 927, 936 (7th Cir. 1998) (dismissing TILA claim against assignee under §1641(e), but maintaining fraud and other claims).  Massachusetts law does not require the Plaintiffs to allege a specific intent to deceive or the Defendants' knowledge of the falsity of the statements (although the facts will show both).  See Evans v. Yegen Associates, Inc., 556 F. Supp. 1219, 1227 (D. Mass. 1982).

Specifically, the Chans allege that WMC (who): failed to provide the required number of copies of the Notice of Right to Cancel; inserted false income of $12,376 per month for Mrs. Chan on their loan documents; knowingly backdated the loan documents to February 15, 2005 in order to request a report on Mr. and Mrs. Chan's credit history prior to their actual loan application; knowingly provided disclosures through its appointed attorney with false loan terms; and in generally created multiple loan applications for the Chans with false information, one of which showed clearly forged signatures of Mr. and Mrs. Chan (what).  The Chans alleged that this occurred between February 2005 and April 25, 2005 (when), or during May 2009 as to when they received the documents with the forged signatures through Saxon, WMC's designated servicer. *Where* this occurred was in telephone conversations and meetings with the Chans and at the lawyer's office.

These knowing misrepresentations by WMC, and Wells Fargo as assignee, induced the Chans into entering a loan that they otherwise would not have entered.  The Chans allege that they did not discuss loan terms until April 6, 2005 (see Amended Complaint, ¶10.), that Mrs. Chan did not have any income and that WMC knew this, (id., ¶ 11), that the Chans did not

complete an actual loan application until April 12 (id., ¶15), and that the WMC representative represented the loan terms as different as they actually were in the final loan, (id., ¶¶12, 25.) Further, WMC, directly and through its appointed counsel, actively concealed the hidden variation to the loan terms at and after the closing.  This easily suffices to state a claim for fraud. See Powers v. Boston Cooper Corp., 926 F.2d 109, 111 (1st Cir. 1991).  The Chans "need not recite the 'exact' words nor must [they] identify the exact date of [their] telephone conversation[s] and identity of the Defendant's employee," as these facts are likely known to WMC already.  Vincent v. Ameriquest Mortg. Co. (In re Vincent), 381 B.R. 564, 574 (Bankr. D. Mass. 2008).  Further, "[t]he loan application contains a file number and the telephone interviewer's name, certainly enough information for [WMC] to identify who spoke on its behalf to the Plaintiffs."  Id. (denying motion to dismiss fraud claim under Fed.R.Civ.P. Rule 9).[13]

Wells Fargo also has directly committed fraud through its actions in concert with Saxon, its servicer, related to the foreclosure.  As the assignee of the Chans' loan, Wells Fargo now possesses the fraudulent loan documents and disclosures and therefore has the knowledge that the information contained therein conflicts dramatically.  Yet Wells Fargo did not prevent Saxon from sending its home service worker to break into the Chans' home under the false pretense it was vacant.  (See Amended Complaint, ¶24.).  Instead of attempting to rectify the serious fraud, Wells Fargo began foreclosure proceedings.  (Id., ¶32.)  Further, as explained above, Wells Fargo, through Saxon, sent the Chans' counsel several purported loan documents on May 19, 2009, some of which contained forged signatures and other terms that had been altered since the Chans had signed them.  (Id., ¶33.)  Therefore, the Chans have alleged the specific who, what, where, and when of Wells Fargo's direct fraudulent actions as well.

---

[13] "Generally, there are three purposes behind Rule 9(b)'s particularity requirement: (1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations."  Id.  The Chans' allegations of fraud are fully consistent with these purposes.

### b.      Saxon's Fraud

The Amended Complaint alleges sufficient allegations of the who, what, where and when of the misrepresentations by Saxon to survive a motion to dismiss.  As explained earlier, the Chans possess evidence that Saxon may have been involved in the closing of their loan, as one of the loan applications provided to them has a facsimile date and time stamp with the area code for Fort Worth, Texas, 682.  (See Chan Aff., ¶9 and Exhibit D attached thereto.)  Saxon is located in Fort Worth, Texas.  (See Amended Complaint, ¶5.)  Thus, the Chans believe that Saxon may have been aware of the drastic conflict between the disclosure terms and the loan terms throughout the relevant time period.[14]

In light of Saxon's possible knowledge of the fraudulent loan, the Chans' allegations regarding Saxon's actions in pursuing foreclosure state a claim for fraud.  Saxon knew or should have known that the Chans fell into arrears under loan terms that they never intended, yet nonetheless it instructed its home service worker to break into the Chans' home.  (Id., ¶20.)  In concert with Wells Fargo, it referred collection of the Chans' debt to a firm which began foreclosure proceedings and did not respond to any of the numerous attempts by the Chans' counsel to discuss the allegations contained in the Amended Complaint.  (Id., ¶32.)

Further, Saxon provided directly to the Chans copies of purported loan documents containing misrepresentations.  This also states with particularity a claim for fraud.  The Chans allege that they received (presumptively via postal mail, thus where) from Saxon (who) on May 19, 2009 (when) purported copies of loan documents that contained both forged signatures of the

---

[14] As explained in the Fact Section, supra at 7-8, WMC had a place of business in Addison, Texas in 2005. Although Addison, Texas is apparently not within the 682 area code, it is located adjacent to that area code and thus it is plausible that the facsimile could have still been sent by WMC from outside its office.  At the very least, the area code stamp shows that this loan application was sent by either Saxon or WMC and thus creates a question of fact that requires further discovery and precludes dismissal at this stage.

Chans and also terms that had been altered after the Chans signed them, including the Notice of Right to Cancel (what).  (Id., ¶33.)[15]

**6.    The Plaintiffs' Alleged Sufficient Facts To Establish A Claim For Negligence Against All Defendants.**

    **a.    WMC**

The Plaintiffs' negligence claims are stated adequately against WMC.  As stated previously, the statute of limitations for these claims survive under the discovery rule.  See supra, at 19.  WMC argues that the Chans' negligence claim requires a fiduciary relationship but provides little support for such an odd suggestion.  (See WMC Mtn. to Dismiss at 12.)  Negligence requires a duty of reasonable care and a breach of that duty, nothing more.  When a lender offers a loan to a borrower, the lender has a duty to negotiate and represent the terms of the loan with reasonable care.  See Fidler v. Central Coop. Bank (In re Fidler), 210 B.R. 411, 432 (Bankr. D. Mass. 1997); reversed on unrelated grounds, Fidler v. Central Coop. Bank (In re Fidler), 226 B.R. 734 (Bankr. D. Mass. 1998).  Further, "it is well settled under Massachusetts law that a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party."  Barden v. Harpercollins Publishers, 863 F. Supp. 41, 44 (D. Mass. 1994).  WMC is correct that a lender is not normally a fiduciary of a borrower; thus a lender's negligence is often based on the terms of the contract.  See  Pimental v. Wachovia Mortg. Corp., 411 F. Supp. 2d 32, 40 (D. Mass. 2006).  Here, WMC's negligence is based on its misrepresentations of the loan terms in the disclosures as compared to in the loan documents.  (See Amended Complaint, ¶¶17, 25.)

    **b.    Wells Fargo and Saxon**

---

[15] The foregoing allegations of fraud against Saxon do not relate to TILA specifically, thus Saxon cannot claim the servicer exemption under TILA.  See 15 U.S.C. § 1641(f); M.G.L. c. 140D, §33(e)(1).

The negligence of Wells Fargo and Saxon, similar to their fraud, arises primarily from their actions after the Chans fell into arrears.  They had a duty to exercise reasonable care in attempting to collect the debt owed by the Chans.  "[N]egligence in the context of debt collection has been recognized in Massachusetts since at least 1971."  Islam v. Option One Mortg. Corp., 432 F. Supp. 2d 181, 198 (D. Mass. 2006) (denying bank's motion to dismiss borrower's negligence claim arising out of debt collection).  Instead, Saxon, the servicer for Wells Fargo, recklessly sent an employee to the Chans' house to break-in and supposedly do winterization work without confirming that the house was vacant, which it was not, causing significant emotion distress to Mrs. Chan who was present in the house at the time.  (See Amended Complaint, ¶24.)  Following this, Saxon refused to discuss the unlawful break-in with the Chans. (Id., ¶25.)  Both Saxon and Wells Fargo refused to discuss the allegations contained in the Amended Complaint with the Chans' counsel.  (Id., ¶32.)  They sent the Chans a collection of purported loan documents that contained forged signatures and other terms that had been altered after the Chans had signed the documents.  (Id., ¶33.)  Neither Wells Fargo nor Saxon exercised reasonable care in attempting to collect on the debt owed by the Chans

**7.     The Plaintiffs' Alleged Sufficient Facts To Establish A Claim Against WMC For Breach Of The Implied Duty Of Good Faith and Fair Dealing.[16]**

The Chans' loan refinancing agreement with WMC included an implied duty of good faith and fair dealing which WMC breached through its actions.  All contracts in Massachusetts include an implied duty of good faith and fair dealing.  See Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 821 (Mass. 1991).  "In loan agreements, the duty of good faith requires that a bank be honest in its dealings with a borrower and not purposefully injure a borrower's

---

[16] As previously explained, Wells Fargo and Saxon have not moved to dismiss Count VI.  Further, this claim is well within the six year statute of limitations.  See Fay v. Aetna Life Ins. & Annuity Co., 307 F. Supp. 2d 284, 290 (D. Mass. 2004); M.G.L. c. 260, § 2.

right to obtain the benefits of the contractual relationship."  <u>Pimental v. Wachovia Mortg. Corp.</u>, 411 F. Supp. 2d 32, 39 (D. Mass. 2006).

As the above language indicates, the implied duty of good faith and fair dealing focuses on the "contractual relationship," not the terms of the actual contract.  The Chans allege that their "contractual relationship" with WMC was rife with misrepresentation and purposeful deceit.  WMC began its dishonesty by requesting a credit check on Mr. and Mrs. Chan long before they had actually filed a loan application (Chan Aff., ¶13 and attached <u>Exhibit H</u>), and later sent the Chans a Balloon Rider, which was specifically represented not to be included in their loan,  *and* asked them to backdate it.  To the extent it is significant, the latter action occurred *after* the loan application was executed and therefore after the Chans and WMC had entered their contractual relationship.[17]

### iv. <u>Conclusion</u>

For the foregoing reasons, the Defendants' motions to dismiss should be denied in their entirety, except as to Counts I and II against Saxon Mortgage Service, Inc.

---

[17] Any suggestion that the Chans received the "benefit of their bargain" and thus cannot recover under a contract theory disregards the extent of their injuries. First, the Chans' did not "bargain" for the loan at issue, but for a loan at significantly different terms.  Second, the Chans' have not benefited but been harmed by the significantly higher APR, the increased adjustable rate, and the other undisclosed changes to the loan terms, including, but not limited to, their house being broken into, the potential foreclosure, and the necessity for the current litigation.

By their attorneys,


/s/ Joseph L. Sulman
Christopher Weld, Jr. (BBO #522230)
Joseph L. Sulman (BBO #663635)
Todd & Weld LLP
28 State Street
Boston, MA  02109
(617) 720-2626
cweld@toddweld.com
jsulman@toddweld.com




September 4, 2009


CERTIFICATE OF SERVICE

I, Joseph L. Sulman, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on September 4, 2009.

/s/ Joseph L. Sulman.
Joseph L. Sulman